IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LATESHA WEATHERINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-414-RAH-SMD |
| | ) | (WO) |
| DOTHAN CITY BOARD OF EDUCATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff LaTesha Weatherington ("Weatherington") brings this employment discrimination action against Defendant Dothan City Board of Education (the "Board" or "DCS"). Before the Court is the Board's Motion for Summary Judgment ("Motion"). (Doc. 18.) The motion has been briefed and is ripe for review. For the reasons stated more fully below, the motion is due to be granted.

## II.    FACTUAL BACKGROUND

Weatherington is presently employed as a school principal by DCS, for whom she has worked continuously, albeit in various positions, since 2003. (Doc. 18-1, p. 49; Doc. 1, p. 4.) Weatherington, a black female, filed this suit after applying for, and being subsequently rejected from, several job openings within the DCS school system. She submits two explanations for the Board's decision to hire other

1

candidates. The first is race discrimination, which she alleges pursuant to both 42 U.S.C. §1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the second is retaliation, which she also alleges pursuant to Title VII. (*See* Doc. 1.) Weatherington separately asserts that the Board awarded higher salaries to two of her male comparators in violation of the Equal Pay Act, 29 U.S.C. § 206(d). (*Id.*, p. 10.)

DCS offers a more innocent explanation for hiring other candidates. According to several of the DCS personnel responsible for hiring, neither race nor retaliation played a role in the Board's review of applications, its interview process, or its hiring decisions. Instead, DCS contends that, as to each of the vacancies forming the basis of Weatherington's suit, it hired the most qualified candidate. (*See* Doc. 19; Doc. 18-2; Doc. 18-3; Doc. 18-6; Doc. 18-7.) In response to Weatherington's Equal Pay claim, DCS challenges Weatherington's assertion that she was equally situated to certain named male comparators, and highlights the differences between the first-year *probationary* principal contract that she held, and the three-year principal contract that her alleged male comparators held. (Doc. 19, p. 50.) It insists Weatherington's gender was not a consideration for determining which contract she was awarded or her salary. (Doc. 18-5; Doc. 19, pp. 50-53.)

### a.    Weatherington's Qualifications

To be sure, Weatherington is a well-qualified school administrator. She boasts two bachelor's degrees – one from Alabama State University and one from Troy University in Dothan – and obtained her master's degree in Education Leadership in 2009, as well as an Education Specialist degree in 2018 – both from Troy University in Dothan. (Doc. 18-1, pp. 54-56.)

Weatherington's history as a DCS employee has been long and largely without incident. DCS first hired her in 2003 to be a teacher (and for a short time, the program specialist) at PASS Academy, where she remained until 2012. (*Id*., pp. 13-14.) Weatherington went on to work in several administrative positions at Dothan High School, where she spent one year as the ninth-grade coordinator and one year as assistant principal. (*Id*., pp. 16, 20.)  She also had a short tenure as principal of Honeysuckle Middle School from October 2014 through December 2015 before the superintendent removed her from the position. (*Id*., pp. 19-20.) She returned to Dothan High as assistant principal in February 2016.[1] (*Id*., pp. 25-26.) Weatherington remains employed by DCS, and most recently stepped into the position of principal at PASS Academy, for which she was awarded a three-year principal contract in the summer of 2020. (*Id*., p. 49.)

---

[1] Dothan High School became Dothan Preparatory Academy in the spring of 2019. Then-Superintendent Dr. Edwards assigned Weatherington to an administrative position at the Dothan Preparatory satellite campus in February 2020. (Doc. 18-1, pp. 47-48.)

Of course, Weatherington's employment with DCS, though it has not lapsed, has not been entirely without discord. This is largely because, in December 2015, then-Superintendent Dr. Charles Ledbetter ("Ledbetter") made the decision to remove her from her position as principal of Honeysuckle Middle School. Because this event is a focus of Weatherington's claims, it is discussed in detail below.

### b.  Weatherington's Transfer from Honeysuckle Middle School

Weatherington applied for and was interviewed to fill the vacant principal position at Honeysuckle Middle School in the fall of 2014. (Doc. 18-1, pp. 24-25.) The interviewing committee recommended Weatherington to the Board for hire, and DCS subsequently issued her a principal contract. (*Id*.) Being that it was her first principal contract, the contract was probationary, as is customary for all first-time principals. (Doc. 18-5, p. 2.) Her first day on the job was in October 2014. (Doc. 18-1, p. 25.)

In December 2015 – 15 months after her tenure at Honeysuckle began – Ledbetter called Weatherington in to meet with him. (Doc. 18-1, pp. 27-28.) It was at this meeting that Ledbetter informed Weatherington that he was removing her from her position as Honeysuckle principal, and he handed her a letter with a notice that she was being reassigned to PASS Academy. (*Id*., pp. 28-29.) According to Weatherington, Ledbetter explained that he wanted to go in a different direction.

(*Id.*) This did not sit well with Weatherington, who apparently refused to sign the transfer letter and left the meeting without saying anything further. (*Id.*)

After the meeting, Weatherington first contacted her representative at the Alabama Education Association ("AEA"), Rhonda Hicks. (*Id.*, pp. 29-30.) Next, she called Franklin Jones, who was serving on the Board of Education at the time. (*Id.*, pp. 29-30.) Weatherington did not lodge any formal complaints on her own behalf with either Ledbetter or the Board concerning her transfer from Honeysuckle, nor did she communicate about the transfer with anyone else other than her lawyer, Clint Daughtrey, who the AEA had assigned to her. (*Id.*, pp. 39-42.)

Weatherington's displeasure with the transfer spurred Daughtrey to initiate a series of conversations with DCS, all of which took place between December 2015 and February 2016.[2] (*Id.*, pp. 35-36.) During this time, Weatherington remained on leave, and did not report to work at Honeysuckle or anywhere else. (*Id.*, pp. 36-37.) By February 2016, Daughtrey and DCS had negotiated a Settlement Agreement ("Settlement Agreement"), (Doc. 18-8), under which Weatherington would request a voluntary transfer to Dothan High as an assistant principal, and DCS would continue paying Weatherington under her probationary principal contract through its

---

[2] The record is conspicuously silent as to whom Daughtrey spoke with, the specifics of those conversations, and, namely, whether anything was said about discrimination against Weatherington. However, DCS stresses it had no notice of Weatherington's discrimination claims prior to the filing of this lawsuit, (Doc. 19, pp. 9-10), and Weatherington offers no evidence to the contrary.

end date in July 2016. (Doc. 18-1, pp. 35-36; Doc. 18-8, pp. 1-2.) By its terms, the Settlement Agreement further specified that Weatherington would be "free to apply for any and all positions posed as vacant by the Board," and that the Settlement Agreement itself could not "be held against her… in considering her application." (Doc. 18-8, p. 2.) In July 2016, Weatherington "revert[ed]" to an eleven-month assistant principal contract. (*Id.*)

### c.   Vacancies for Which Weatherington was Nonselected

After her transfer from Honeysuckle and return to Dothan High, Weatherington applied for six separate job openings in the DCS system.[3] (*See* Doc. 1.) For each position made the basis of this suit, the Board made the final hiring decisions based on recommendations submitted by the superintendent and relevant personnel. The facts relating to each position, viewed in the light most favorable to Weatherington, are explained in turn.

### i.   *Supervisor of Exceptional Educational Services*

In April 2016, Weatherington applied for the Supervisor of Exceptional Educational Services vacancy. (Doc. 18-1, pp. 112-13.) The position was based in the central office and entailed assisting the director of the special education department, overseeing the staff in the department, and monitoring legal updates relevant to educating students with disabilities. (Doc. 18-7, p. 1.) It was Carol

---

[3] All the while, she remained employed as an assistant principal at Dothan High School.

Cunningham, a white female and the Director of Exceptional Student Services at the time, who interviewed Weatherington for the position and recommended hiring a different candidate, Alicia Hales, as the superintendent. (*Id*.; Doc. 18-1, pp. 117-18.)

As it relates to Weatherington's qualifications for the position, Weatherington points to her time as the designated "special ed administrator" at PASS Academy and Dothan High School. (Doc. 18-1, p. 114.) By contrast, Hales, a white female, already had direct involvement with the Exceptional Services department throughout her time as a school psychometrist. (Doc. 18-7; *see* Doc. 18-11.) Then-superintendent Ledbetter agreed with Cunningham's assessment that Hales was more qualified, and the Board hired Hales in May 2016 on his recommendation. (Doc. 18-4, p. 3.)

### ii.      *Cloverdale Elementary Principal*

Todd Weeks was serving as the interim DCS superintendent in May 2017 when the Board was hiring for the vacant Cloverdale Elementary principal position. (Doc. 18-1, pp. 64-65.) Weatherington applied for the position and was interviewed by Weeks, a process that was unlike her other DCS interview experiences.[4] (*Id*., p.

---

[4] Regarding DCS's interview practices, Weatherington said: "One – one time you have a committee of five people. The next time you have one person. The next time you have two people. One interview you get a list of questions. The next interview you don't. I mean, it's all over the place…." (Doc. 18-1, pp. 167-68.) For example, DCS conducted interviews for certain positions by committee, as it did with the Honeysuckle position. Others, including the Cloverdale position, were conducted by only one person. (*Id*., p. 66.) Specifically, Weatherington noted DCS's failures to convene an interview committee and require candidate "rankings" for all positions. (*Id*.)

66.) Additionally, in her deposition, and as DCS points out in its Motion, Weatherington took issue with the outgoing principal's show of favoritism, which she believed to have clouded DCS's judgment in hiring for this position.[5] (Doc. 18-1, pp. 77-79; Doc. 19, p. 13.) Weeks ended up recommending Christy Martin, a white female, to the Board for hire based on her history working at Cloverdale and her proven track record as part of its administration. (Doc. 18-3, pp. 1-2.) The Board adopted Weeks' recommendation.

### iii.        Highlands Elementary Principal

Weatherington applied for the Highlands Elementary Principal position in June 2018, but DCS did not select her for an interview. (Doc. 18-1, pp. 95, 98.) Based on the affidavit of Dr. Phyllis Edwards ("Edwards"), who became superintendent of DCS in February 2018, DCS assembled an interview committee for this position, and the committee then ranked candidates based on their interview performance. (Doc. 18-2, p. 2.) Though it is not entirely clear which applicants DCS interviewed for the position, at least one black female, Erica Hall, did receive an interview. (Doc. 18-1, p. 103; Doc. 18-3, p. 2.)

Weatherington believes that retaliation, in addition to racial discrimination, is to blame for her nonselection based on her qualifications as compared to Hall, who

---

[5] Weatherington testified that the outgoing principal had told several Cloverdale teachers that "Christy [Martin] was going to get the job." (Doc. 18-1, p. 78.)

Weatherington believes had less administrative experience. (Doc. 18-1, p. 103.) And she once again questions the involvement of an outgoing principal, in this case, Vicki Davis, though Edwards disputes this. (*Id*., p. 104.) Edwards recommended Blakelynn Barker to the Board, and Barker was hired. (Doc. 18-2, pp. 2-3.) Barker, a white female, had five years of experience as a school principal and positive recommendations making her the most qualified applicant in Edwards' and Weeks' view. (*Id*.; Doc. 18-3, p. 2.) They maintain that neither race nor retaliatory motives played a factor in this decision.

### iv.        *Federal Programs Director*

The next position for which Weatherington applied was the Federal Programs Director – a position based in the DCS central office. (Doc. 18-1, pp. 126-27.) She was given an interview, which was conducted on November 30, 2018 by a three-member committee consisting of Lee Jacobs, a white female; Mike Manual, a white male; and Scott Faulk, a black male. (*Id*., p. 130.) The committee asked each candidate the same questions and, based on their answers, ranked them from best to worst. (*Id*., p. 130; *see* Doc. 18-12.) Jacobs presented Chris Duke, the highest-ranking candidate, to Edwards, who then recommended Duke to the Board for hire. (*See* Doc. 18-6; Doc. 18-2, p. 3.) Of the seven interviewees, Weatherington ranked last. (Doc. 18-12.)

Duke, a white male, had considerable experience developing and implementing federally funded programs in his former role as a Career Tech Director and "seemed to have a very professional manner in dealing with difficult situations." (Doc. 18-6, pp. 2, 6.) The candidate pool for this position was indeed competitive. Weatherington herself concedes that candidate Donnie Chambers, who ranked second, was "very bright" and had the "same qualifications" that she had, though she could not speak to his performance in the interview. (Doc. 18-1, pp. 135-36.) Moreover, Charles Corbitt – one of the other candidates who ranked above Weatherington – was also black. (Doc. 19, pp. 16-17; Doc. 18-1, pp. 136-37.) Weatherington also admits to helping another higher-ranked white candidate, though she could not speak precisely to the disparity in their respective rankings. (Doc. 18-1, pp. 136-37.)

### v. *Curriculum Director*

Weatherington applied for the Curriculum Director vacancy in early 2019. (Doc. 18-2, p. 3.) A committee, which consisted of Lee Jacobs, Jeff Hatfield, and one other unknown person, selected and interviewed the top candidates from the applicant pool. (Doc. 18-1, p. 146.) Edwards then personally interviewed and ranked the top two candidates; Weatherington was not among them. (*Id*.; Doc. 18-2, p. 3.) Ultimately, Dr. Edwards recommended Maria Johnson, a white female, to the Board for hire, citing her extensive experience as a principal, relationship with school

10

administrators across the system, and curriculum and assessment background. (Doc.

18-2, pp. 3-4.) Weatherington, Edwards contends, lacked the relevant experience

and the requisite relationships with other administrators. (*Id*.)

When asked whether she is alleging to have been more qualified than Johnson,

Weatherington responded, simply, "No." (*Id*., pp. 145-46.) She further confessed

that she did not know whether Jacobs, one of the relevant hiring personnel, was privy

to her transfer from Honeysuckle or subsequent Settlement Agreement with DCS.

(*Id*., p. 147.) For her part, Jacobs asserts she does not have any knowledge of the

"particulars" of the Settlement Agreement, nor had she been aware of any

discrimination claims by Weatherington prior to the filing of this lawsuit. (Doc. 18-

6, p. 3.)

### vi.      *Girard Intermediate Principal*

Most recently, in the summer of 2019, Weatherington applied to fill the

principal vacancy at Girard Intermediate School.[6] (Doc. 18-1, p. 161.) For this

position, DCS again assembled a small committee, this time comprised of Maria

Johnson and Sue Clark, to select and interview applicants. (Doc. 18-2, p. 4.) The

committee then ranked interviewees, and Edwards recommended top performer,

---

[6] This lawsuit was filed on June 13, 2019, meaning that this particular cause of action arose *after* Weatherington filed her complaint. (*See* Doc. 1; Doc. 18-2, p. 161.)

Sara Bouchard, a white female she considered the most qualified applicant, to the Board for hire. (*Id.*)

In explaining this decision, Edwards pointed to Bouchard's background with International Baccalaureate ("IB") programs, which was an attractive resume line in light of DCS's plan to convert Girard from a middle school to an IB elementary school. (*Id.*) She additionally noted Bouchard's deep knowledge of budgets and background in curriculum development, among others. (*Id.*) Meanwhile, Weatherington charges that she, too, was well qualified for the post and had the relevant experience and, "[again], a white female was hired for the job." (*Id.*, p. 165.)

### d.   Weatherington's Salary

As noted above, when the Board hired Weatherington to fill the principal position at Honeysuckle in 2014, it offered her a probationary principal contract. (Doc. 18-1, pp. 186-87.) Her annual salary was set at **$80,659.50**, effective October 10, 2014 through June 30, 2016. (*See* Doc. 18-19.)

### i.   *Types of Principal Contracts and Salary Considerations*

DCS relies on Dennis Coe, its Chief Operating Officer, to explain the particulars of its pay scale for principals and how it determines where an employee falls on that scale. Alabama Code § 16-24B-3, Coe notes contextually, differentiates between probationary principals and contract principals. (Doc. 19, pp. 21-22; Doc. 18-5.) Where *probationary* principals are those employed as a principal for the first

time, *contract* principals have already completed their probationary period and therefore have already served as a probationary principal; thus, they are afforded greater legal protections. *See* Ala. Code § 16-24B-3(a). It is at the discretion of the employing board to determine whether a probationary period is appropriate, and it may call for a probationary period to last for up to two full contract years. *Id*. Salary amounts are commonly based upon a principal's probationary status, and higher salaries may be negotiated and awarded to principals – particularly contract principals – based on prior experience and a history of success. (Doc. 18-5, p. 3.)

### ii.   *Male Comparators*

Weatherington identifies two male comparators as the basis for her Equal Pay Act claims.

#### 1.   Jeffrey Torrence

DCS hired Jeffrey Torrence ("Torrence") to be a principal under a probationary contract for a two-year term beginning on February 11, 2014 and ending on February 10, 2016. (*See* Doc. 18-13.) Under the probationary contract, his annual salary was set at **$80,251.86**. (*Id*., p. 2.) After completing this probationary period, Torrence became the principal of Honeysuckle Middle School (as Weatherington's replacement) in February 2014. (Doc. 18-5, p. 3.) At this point, DCS offered him a three-year principal contract with an annual salary of **$95,000.00**. (*Id*.; Doc. 18-14, p. 2.) And when the three-year contract ended on June 30, 2019,

DCS once again employed him under a three-year principal contract for which Torrence negotiated a slightly higher annual salary of **$95,220.00**. (Doc. 18-15, p. 2.) Torrence remains employed by DCS, and his present contract is set to end on June 30, 2022. (*Id.*, p. 1.)

### 2.    Darius McKay

Prior to his employment with DCS, Darius McKay ("McKay") had six years of experience as an assistant principal and two years of experience as a principal in a different school system. (Doc. 18-5, p. 3.) He was hired by DCS as a probationary principal to fill the vacancy at Girard Middle School (now Girard Intermediate) for a period that would last only one year, from July 28, 2015 through June 30, 2016. (*See* Doc. 18-16.) For this time, his salary was set at **$78,164.47**. (*Id.*, p. 2.) In July 2016, DCS hired McKay to remain at Girard under a three-year principal contract at a salary of **$92,000.00**, (Doc. 18-17, p. 2), and again in July 2019 at a salary of **$95,220.00** (Doc. 18-18, p. 2). His current contract will end on June 30, 2022. (*Id.*, p. 1.)

## III.   PROCEDURAL HISTORY

### a.    Filing of EEOC Charge

On September 25, 2018, Weatherington filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*See* Doc. 18-10.) She identified race, retaliation, sex, and gender as the bases of her charge and claimed it

was a continuing action with the latest act of discrimination occurring on June 30, 2018.[7] (*Id.*) The charge also contains a summary of Weatherington's complaints about DCS's allegedly discriminatory employment practices, including compensating male employees more than female employees, failing to adopt and implement standard hiring practices, retaliating against her due to her prior claims of discrimination, and hiring less qualified white applicants over more qualified black applicants. (*Id.*) No amendments were ever made to the charge.

### b.    The Present Action

Weatherington filed her Complaint, (Doc. 1), on June 13, 2019, and DCS filed its Answer on July 18, 2019, (Doc. 6). In her Complaint, Weatherington includes four counts. Counts One and Two address her race discrimination allegations as they relate to DCS's failure to hire or promote her on six separate positions, dating back to 2016. Her claims in Count One proceed under Section 1983, and in Count Two, under Title VII. Notably, Weatherington clarifies that, as it pertains to Count Two, she bases her claims only on the following five positions: Supervisor of Exceptional

---

[7] On her EEOC charge, Weatherington recounts only two positions for which DCS failed to hire her, including the Highlands Elementary Principal and Cloverdale Elementary Principal positions. (Doc. 18-10.) Instead of mentioning the other positions discussed in her Complaint with any specificity, she vaguely references the "bias, discrimination, and favoritism" demonstrated by the Board's system-wide hiring practices. (*Id.*) The Court notes that this omission alone does not preclude judicial review of factual allegations made in the Complaint; however, the Complaint is "limited by the scope of the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination." *Kelly v. Dun & Bradstreet, Inc.*, 557 F. App'x 896, 899 (11th Cir. 2014).

Services, Cloverdale Elementary Principal, Highlands Elementary Principal, Director of Federal Programs, and Girard Intermediate Principal. Count Three also addresses Weatherington's failure to hire/promote claims, which she attributes to retaliation under Title VII. She alleges retaliation for only five of the six positions discussed in the facts: Cloverdale Elementary Principal, Highlands Elementary Principal, Director of Federal Programs, Curriculum Director, and Girard Intermediate Principal. Count Four asserts a separate and distinct claim under the Equal Pay Act,[8] which she bases upon her salary as compared to two male principals at DCS.

DCS filed its Motion along with a brief and evidentiary submission in support of the Motion, (Doc. 18; Doc. 19), on July 13, 2020. Weatherington filed her response brief in opposition to DCS's Motion, (Doc. 26), on September 25, 2020. DCS filed its reply brief, (Doc. 29), on October 12, 2020.

## IV.   JURISDICTION

---

[8] Weatherington ostensibly makes a last-ditch attempt to assert an additional claim of gender discrimination on a failure to hire or failure to promote basis on the last page of her brief opposing summary judgment. (Doc. 26, p 23.) But apart from allegations of Equal Pay Act violations, the Complaint makes no reference to gender discrimination with respect to DCS's failure to hire Weatherington into any of the vacancies discussed. Because such a claim cannot be properly brought at the summary judgment stage, the Court refuses to address it now. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint.").

Subject matter jurisdiction is confered by 28 U.S.C. §§ 1331 as to Weatherington's federal causes of action. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## V.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A district court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *See, e.g., Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). Just as importantly, a court cannot make decisions as to the merits of properly disputed factual issues. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex*, 477 U.S. at 323 (1986); *see, e.g., Weinberger v. Hynson, Westcott & Dunning*, 412

U.S. 609, 622 n.18 (1973). A party asserting that a fact cannot be or is genuinely disputed can support such a statement by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323, 325. Alternatively, the movant can do one of two things. It can contend that the materials cited do not establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1)(B); *Fuller v. SL Alabama, LLC*, 56 F. Supp. 3d 1232, 1236 (M.D. Ala. 2014). Or, if it will not bear the burden of production at trial, it can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *See, e.g., Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

In applying Rule 56, a court must heed two definitions. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Id.* at 248. As a matter of course, "[d]isputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment." *Kingsley v. Tellworks Commc'ns., LLC*, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *14 (N.D. Ga. May 24, 2017). Meanwhile, an issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 77 U.S. at 250. Essentially, a genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## VI.   DISCUSSION

### a.   Claims and Limitations Periods

Before addressing the merits of Weatherington's claims, the Court must address DCS's preliminary contentions that one of Weatherington's race

discrimination claims brought under Section 1983 is time-barred, and additionally that four of the race discrimination and four of the retaliation claims brought under Title VII should be dismissed for Weatherington's failure to exhaust her administrative remedies.

### i.   Weatherington's Time-Barred Claim

"All constitutional claims brought under Section 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the Section 1983 action has been brought." *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008); *see* 42 U.S.C. § 1988(a). In Alabama – the forum state in which Weatherington has raised her claims – the governing limitations period is two years. Ala. Code § 6-2-38(l); *Lufkin v. McCallum*, 956 F.2d 1104, 1106 n. 2 (11th Cir. 1992). Accordingly, she was required to bring her claims within two years from the date the limitations period began to run.

The Eleventh Circuit has long held that "the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for [their] rights." *Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir.1987). It bears iterating that an alleged series of discrete decisions not to hire or promote do not constitute a continuing violation for statute of limitations purposes in actions brought pursuant to Section 1983. *See, e.g.*, *Smith v. Alabama Dep't of Corr.*, 131 F. Supp. 2d 1318,

20

1321 (M.D. Ala. 2001); *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (holding that each instance of failing to hire is a discrete act that cannot constitute a continuing violation).  Thus, each instance where DCS failed to hire Weatherington gave rise to a separate cause of action.

The two-year statute of limitations period bars the Section 1983 race discrimination claims that Weatherington bases upon DCS's failure to award the position of Supervisor of Exceptional Services to her. Because DCS awarded the position to Alicia Hales in May 2016, Weatherington should have filed suit prior to the expiration of the limitations period in May 2018. She did not do so.  Therefore, DCS's motion for summary judgment is due to be granted as to this time-barred employment decision. Weatherington's remaining Section 1983 claims are timely and therefore are evaluated on the merits below.

### ii.      *Failure to Exhaust Administrative Remedies*

#### 1.      Timely EEOC Charge Requirement

DCS's second preliminary contention is that Weatherington failed to exhaust her administrative remedies as required by Title VII. More specifically, DCS claims Weatherington failed to timely file EEOC charges with respect to the racially discriminatory selection of the following positions: Supervisor of Exceptional Services, Cloverdale Elementary Principal, Director of Federal Programs, and Girard Intermediate Principal. (Doc. 19, pp. 27-28.) It further claims she failed to

21

timely file EEOC charges as to the retaliatory nonselection of her for the following positions: Cloverdale Elementary Principal, Director of Federal Programs, Curriculum Director, and Girard Intermediate Principal. (*Id*.) By process of elimination, the only Title VII claims Weatherington has preserved, DCS argues, are those that relate to the Highlands Elementary Principal position.

As a condition precedent to filing a Title VII suit in federal court, a plaintiff must first exhaust her administrative remedies by filing a charge with the EEOC. *See Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1567 (11th Cir. 1996); 42 U.S.C. § 2000e-5(e)(1). In this Circuit, specifically, a plaintiff is limited to filing his or her charge within 180 days after the alleged unlawful employment practice occurred, and failure to do so "generally results in a bar of the claims contained in the untimely charge." *Id*.; *Reed v. Winn Dixie, Inc.*, 677 F. App'x 607, 610 (11th Cir. 2017) (citing *Alexander v. Fulton Cty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000)).

Once a plaintiff has filed an EEOC charge, she must amend it to include any new discrete acts of employment discrimination that occur. *See Kelly v. Dun & Bradstreet, Inc.*, 557 F. App'x 896, 899 (11th Cir. 2014). Where allegations of employment discrimination have not been administratively considered, a judicial finding of discriminatory conduct is not proper. *Id*.   Failures to promote or hire are discrete acts that must be amended into an existing charge, or filed as a new charge,

in order to be actionable. *See Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 893 (11th Cir. 2014) (holding that after a new discrete act, plaintiff must amend his EEOC charge for it to be actionable); *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002)(citing *E.E.O.C v. Joe's Stone Crabs, Inc.* for the proposition that failure to hire incidents are discrete events that do not constitute a continuing violation).

In the instant case, Weatherington did not file an EEOC charge until September 25, 2018. (*See* Doc. 18-10.) By failing to file earlier, she failed to preserve any Title VII claim that accrued prior to March 24, 2018. For ease of reference, each of her Title VII claims accrued at the following times:

| Supervisor of Exceptional Services | April 2016 |
|---|---|
| Cloverdale Elementary Principal | July 2017 |
| Highlands Elementary Principal | September 2018 |
| Federal Programs Director | December 2018 |
| Curriculum Director | March 2019 |
| Girard Intermediate Principal | July 2019 |

By this measure, Weatherington did not comply with the 180-day deadline applicable to either the Supervisor of Exceptional Services or Cloverdale Elementary positions, which occurred more than 29 months and 14 months, respectively, before she filed her EEOC charge. Likewise, she failed to amend her EEOC charge to reflect the alleged discriminatory conduct that accrued subsequent to her initial filing, namely that conduct related to the Federal Programs Director position,

23

Curriculum Director position, and Girard Intermediate Principal position, and she further did not file any additional EEOC charges in her allotted 180-day timeframe.

Weatherington's failure to exhaust provides an independently sufficient basis to grant summary judgment in DCS's favor on most of Weatherington's Title VII claims, the only exception being her race discrimination and retaliation claims linked to the Highlands Elementary position. The Court will accordingly address claims related to the Highlands Elementary position on the merits.

2.     Continuing Violation Doctrine

Weatherington contends that the discrimination of which she complains is a "continuing action" and therefore her failure to file an EEOC charge within 180 days of each separate incident of alleged employment discrimination is legally excused. To support this, she cites *Anderson v. Embarq/Spring*, 379 F. App'x 924, 926 (11th Cir. 2010), in which the Eleventh Circuit explained that a plaintiff's complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." (Doc. 26, p. 13.) The *Anderson* court continued, holding that new claims "are allowed if they amplify, clarify, or more clearly focus the allegations of the EEOC complaint." *Id.* (citations omitted). Without applying any of the relevant facts to the stated law, Weatherington leaves this Court to presume that her opposition to summary judgment on exhaustion

grounds turns on the continuing violation doctrine, which would not apply in the instant case even if it had been correctly alleged.

When the continuing violation doctrine does apply, it allows an employee who has filed a timely EEOC charge to bring claims for previous acts of discrimination which would otherwise be time-barred. *See Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 800 (11th Cir.), *opinion amended on reh'g*, 850 F.2d 1549 (11th Cir. 1988). In determining whether a violation is truly "continuing," the Eleventh Circuit distinguishes "between the present consequence of a one-time violation, which does not extend the limitations period, and the continuation of that violation into the present, which does." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993).

The continuing violation doctrine "does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse." *Id*. Yet, that is exactly what Weatherington is attempting to do. But instead of demonstrating that the consequences of the alleged discriminatory conduct have extended into the present, Weatherington has demonstrated only that her injury following each alleged act of discrimination was the same: she was not awarded the job. This is not enough. Commonality of injury does not suggest that each discrete violation was itself continuing. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977).

Each decision not to hire or promote Weatherington was permanent and had an immediate consequence sufficient to put her on notice that a cause of action had accrued. In following well-settled precedent, this Court now finds the continuing violation doctrine cannot apply in the instant case, and that each failure to promote or hire Weatherington stands as its own discrete cause of action. *See, e.g., Stuart v. Jefferson Cty. Dep't of Human Res.*, 152 F. App'x 798, 801 (11th Cir. 2005) (holding employee's failure to promote claim not included in his EEOC charge was procedurally barred because it did not grow out of previous failure to promote claims); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as … failure to promote … or refusal to hire are easy to identify…. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").

### b. Race Discrimination

The Court now turns to the merits of Weatherington's remaining claims, beginning with her race discrimination claims. When she filed her complaint, she alleged race discrimination, under Section 1983 and Title VII, against the Board for its failure to hire or promote her into the following five positions[9]: Supervisor of

---

[9] In her deposition, Weatherington clarified that she is not alleging race discrimination as it concerns DCS's failure to hire her to fill the Curriculum Director vacancy. (Doc. 18-1, p. 146.)

Exceptional Services[10], Principal of Cloverdale Elementary School, Principal of Highlands Elementary School, Director of Federal Programs, and Principal of Girard Intermediate School. Based upon the statute of limitations pertinent to her Section 1983 claims and the Title VII exhaustion requirement, not all of these claims warrant the Court's analysis. Weatherington's only remaining Section 1983 claim (Count I) relates to the Principal of Cloverdale Elementary School, Principal of Highlands Elementary School, Director of Federal Programs, and Principal of Girard Intermediate School positions; pursuant to Title VII (Count II), her only actionable claim relates to the Highlands Elementary School position.

The Fourteenth Amendment's Equal Protection Clause prohibits intentional race discrimination in public employment. *Bush v. Houston Cty. Comm'n*, 414 F. App'x 264, 266 (11th Cir. 2011). Section 1983, which prohibits the deprivation of a federal right by a "person acting under color of state law," provides a cause of action for a Fourteenth Amendment violation. 42 U.S.C. § 1983; *see Albright v. Oliver*, 510 U.S. 266, 271 (1994) (noting Section 1983 provides a method for vindicating infringement of constitutional rights). Title VII similarly prohibits employers from refusing to hire any individual, or otherwise discriminating against any individual, "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

---

[10] All claims linked to the Supervisor of Exceptional Services position have been barred entirely. The statute of limitations already has run on her Section 1983 claim for that position, and her Title VII claim is barred by Weatherington's failure to exhaust her administrative remedies.

§ 2000e-2(a)(1). Because the legal elements for Section 1983 and Title VII are identical, the Court will analyze the claims under both pertinent laws concurrently. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (noting that, in the employment context, race discrimination claims under Title VII and Section 1983 have the same legal elements); *Bush*, 414 F. App'x at 266 (same).

### i.   *Burden-Shifting Legal Framework*

Disparate treatment claims, such as Weatherington's, require proof of discriminatory intent, whether by direct or circumstantial evidence. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984). Direct evidence proves a fact without inference or presumption and generally takes "the form of actions or remarks of the employer reflecting a discriminatory attitude." *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1539 (11th Cir. 1988).

Absent such evidence, a plaintiff may prove its case through circumstantial evidence by relying on the analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Both parties acknowledge that Weatherington's race discrimination claims are premised solely on circumstantial evidence, (Doc. 19, p. 30; Doc. 26, pp. 9-10), and are thus subject to the three-step burden-shifting framework set forth in *McDonnell Douglas*.

Under this indirect methodology, the plaintiff carries the "initial burden … of establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp.*, 411 U.S. at 802. To make out a prima facie case of racial discrimination in a failure to hire context, and thus raise an inference of discriminatory intent, a plaintiff must show that: (1) she belongs to a protected class; (2) she applied and was qualified to fill a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) someone outside the protected class who was not better qualified was hired instead. *See Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). The comparators for the fourth prong must be "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (*en banc*).

By meeting her prima facie burden, a plaintiff creates a "rebuttable presumption" that her employer engaged in unlawful discrimination. *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citations omitted). The burden then shifts to her employer to rebut this presumption, which it can do with evidence that its conduct was taken for some legitimate, non-discriminatory purpose. *Id*. at 1273 (citations omitted).

Finally, if the employer successfully meets its burden of production, the plaintiff "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *Joe's Stone*

*Crabs, Inc.*, 296 F.3d at 1272. A reason is not pretext without a showing that the reason was false and that the real reason was, in fact, discrimination. *See Milledge v. Rayonier, Inc.*, 192 F. App'x 863, 865 (11th Cir. 2006). Examples of what would satisfy the pretext prong include a showing that an employer's proffered legitimate reason had no basis in fact, that it did not actually motivate the employment decision, or that it would have been insufficient, on its own, to do so. *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995). And in a failure to promote or hire context, courts could look to "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the proffered legitimate reasons that would support a factfinder's inference that they were "unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

"Although the immediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Id*. (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

For the purpose of its motion for summary judgment, DCS concedes that, as to each unlawful employment decision alleged, (1) Weatherington was a member of a racial minority; (2) she applied for and was qualified for each job; and (3) she was not hired to perform the jobs made the basis of her claims. However, the fourth element is deeply disputed. For its part, DCS argues that Weatherington cannot

establish a prima facie case, nor can she present any evidence of pretext, because she cannot show that she was equally or more qualified than each successful candidate or that DCS otherwise acted discriminatorily. (Doc. 19, p. 31.) DCS maintains that it hired the most qualified candidate for each vacant position, thereby precluding any showing of discriminatory motive. Weatherington's brief, which is little more than a recitation of the relevant law, does little to challenge DCS's argument or the evidence that it presents, but the Court nevertheless addresses whether, based on the record evidence, Weatherington has met her burden for her remaining disparate treatment claims. As explained, she has not, and therefore DCS is due summary judgment.

### 1.   Weatherington's Prima Facie Case

DCS principally argues that Weatherington has not proffered adequate comparators who received any advantage in the hiring process or were less or equally qualified as compared to Weatherington. The Court agrees.

Weatherington's failure to satisfy her prima facie burden hinges on the "similarly situated" language in the fourth prong, which the Eleventh Circuit recently clarified in its decision in *Lewis v. City of Union City*. In *Lewis*, the Eleventh Circuit rejected the district court's attempt to defer a comparative qualification analysis to the pretext inquiry and held that this analysis remains part of the initial prima facie stage of the *McDonnell Douglas* framework. *Lewis,* 918 F.3d at 1218.

The result is that, at this stage, the plaintiff must identify a comparator to whom she was similarly situated in "all material respects." *Id.* at 1220-21; *but see Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) (subjective assessments of the candidates play no part in analyzing plaintiff's prima facie case and rather, should be evaluated in turn as part of the employer's burden to produce a race-neutral basis for its hiring decision and as part of the court's pretext inquiry); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) ("Because [plaintiff's] job performance is bound up in the inquiry into whether [defendant's] proffered reason for firing her was a pretext for discrimination, we will consider it at the pretext stage of the analysis.").

A proper comparator ordinarily will have engaged in the same basic conduct (or misconduct) as the plaintiff, been subject to the same employment policies and rules as the plaintiff, and may have reported to the same supervisor as the plaintiff. *Lewis,* 918 F.3d at 1227-28. Ultimately, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The Court assesses Weatherington's proffered comparators position-by-position.

   *a.*  *Cloverdale Elementary Principal*

For the Cloverdale position, Weatherington identifies Christy Martin as her comparator. Martin, a white female, was the successful candidate for the Cloverdale principal position. And despite her prior experience as an administrator at Cloverdale, Martin had never been a school principal. Still, Weatherington has not shown that she was similarly situated to Martin in all material respects and cannot prevail on the claim that Edwards' recommendation and the Board's subsequent approval was unlawful. [11]

Most significantly, Martin and Weatherington do not share a similar history regarding successful completion of their roles in the DCS system. Weatherington disputes Martin's comparative qualifications based on Weatherington's tenure as Honeysuckle principal – a role she believes should have distinguished her from other candidates. But as the DCS highlights, this overlooks Weatherington's inability to successfully carry out the role of principal because Weatherington was removed from that position. (Doc. 19, p. 37.) DCS instead suggests that when it hired Martin at the recommendation of interim-Superintendent Weeks, it took note of her prior experience and "proven track record" within the Cloverdale school's administration.

---

[11] The "cat's paw" theory of liability permits the discriminatory animus of a non-decisionmaker to be imputed to a neutral decision maker – or DCS, as Weatherington alleges in this case – that acted as a mere conduit. *Crawford v. Carroll*, 529 F.3d 961, 979 n. 21 (11th Cir. 2008). For example, if there was any evidence of discriminatory animus tied to any of the superintendent's hiring recommendations, then the Board's "rubber stamp" on that recommendation would subject DCS to liability for race discrimination.

Additionally, DCS notes that Weatherington had no previous experience working in either an administrative or teaching capacity at an elementary school. (Doc. 18-3, pp. 1-2.) Martin, by contrast, was already an elementary administrator at Cloverdale and had preexisting relationships with parents and students at the school.

These differences, which DCS duly considered when it hired Martin, (*id*.), show that Weatherington and Martin are not similarly situated in all material respects. *See Brown v. Synovus Fin. Corp.*, 783 F. App'x 932, 930 (11th Cir. 2019) ("None of [the plaintiff's] colleagues constitute comparators because they occupied different positions, had different certifications, or worked for different supervisors than [the plaintiff].").

### b.     *Highlands Elementary Principal*[12]

Like above, Weatherington has fatally proffered no *adequate* comparators in conjunction with the Highlands principal position. She does, however, proffer two inadequate comparators: Brooklyn Barker, a white female and the successful candidate; and Erica Hall, a black female who was awarded an interview but not hired to fill the post. Both comparators were selected for an interview; Weatherington was not.

---

[12] This is the only position for which Weatherington's Section 1983 and Title VII race discrimination claims both remain.

34

As for Barker, Weatherington cannot successfully put her approximate year-long failed tenure as a principal up against Barker's five years of experience doing the same. That Barker received a positive recommendation sets her candidacy further apart.  There is no evidence that persuades the Court that it can put the distinct employment histories of Barker and Weatherington side by side, particularly with the consideration that Barker gained her prior experience in an elementary school. (Doc. 18-2, p. 3.) The two were simply not similarly situated in all material respects. *See Mathis v. Wachovia Bank*, 255 F. App'x 425, 431 (11th Cir. 2007) (a relevant difference in experience precludes finding that comparators were similarly situated).

Next, the Court notes that Hall, who was selected to interview, was also a black female, and this similarity in race certainly cuts against Weatherington's allegations of race discrimination. Hall, by definition, cannot be a comparator. She is a black female like Weatherington and thus a member of the same protected class, meaning that any disparities in treatment between the two is necessarily attributable to some factor other than race. *See, e.g.*, *Herron-Williams v. Alabama State Univ.*, 287 F. Supp. 3d 1299, 1314 (M.D. Ala. 2018), *aff'd*, 805 F. App'x 622 (11th Cir. 2020) (comparator cannot be a member of the same protected class).

### c.   *Director of Federal Programs*

Chris Duke, a white male who was hired for the Federal Programs position, is yet another unsuitable comparator for Weatherington. Jacobs, who was among those

individuals on the hiring committee for the position, documented the committee's recommendation to hire Duke as based upon his considerable experience developing and implementing federally funded programs. (Doc. 18-6, p. 5.) She also cited to Duke's exemplary interview performance, for which he ranked first out of seven interviewees. Meanwhile, Weatherington has presented no evidence to this Court highlighting that she had any experience managing large budgets that would have better equipped her for the job, and she ranked seventh after interview scores were tallied. (Doc. 18-12.) Under the facts before the Court, there is no indication that Weatherington and Duke were similar based in greater part on the chasm created by their dissimilar employment histories. *See Synovus Fin. Corp.*, 783 F. App'x at 930.

In her deposition, Weatherington testified that DCS also refused to hire the undisputedly bright Donnie Chambers for the job. Chambers is a white male who Weatherington believes shared the "same qualifications" as her. (Doc. 18-1, p. 135.) He was ranked second after his interview. But the record is devoid of any further information about Chambers' credentials, and the Court does not have enough information to conclude he was similarly situated to Weatherington. *See Herron-Williams*, 287 F. Supp. 3d at 1313 (refusing to acknowledge an unnamed comparator was similarly situated without further evidence vis-à-vis demographics or credentials). The same can be said for Charles Corbitt, a black male who was ranked

sixth after his interview, though the fact that Corbitt was treated more favorably than Weatherington despite his race does little to advance her disparate treatment claim.

### d.   Curriculum Director

Next, Weatherington avers that her rejection from the Curriculum Director position at DCS's central office was racially discriminatory and attempts to meet her prima facie burden by identifying Maria Johnson as a comparator. Again, this comparator is inadequate.  When asked whether she is alleging to have been more qualified than Johnson, Weatherington responded, simply, "No." (Doc. 18-1, pp. 145-46.) This concession is weighty. When compounded with a consideration of Johnson's objective qualifications, including prior extensive experience as a principal, system-wide relationships with administrators, and an extremely pertinent curriculum background, there is simply no evidence that Johnson and Weatherington were similarly situated. *See, e.g.*, *Felder v. Bradford Health Servs.*, 493 F. App'x 17, 20 (11th Cir. 2012) (two alleged comparators with different experiences, credentials, job duties, and qualifications were not similarly situated).

### e.   Girard Intermediate Principal

The hiring of Sara Bouchard as Principal at Girard Intermediate School is the basis for Weatherington's final race discrimination claim and is yet another for which this Court cannot discern a sufficiently situated comparator. Bouchard boasted a unique background working with the International Baccalaureate ("IB")

curriculum, which in and of itself distinguishes her candidacy from Weatherington's candidacy and uniquely prepared her for an administrative role at a school that was transitioning to an IB curriculum. Weatherington, whose experience was primarily in secondary education administration at PASS Academy and Dothan High, and who had no IB experience, was not similarly situated to Bouchard.

### 2.   Race-Neutral Reasons for Hiring Decisions and Pretext

Even if the Court were to accept Weatherington's comparator theories, it cannot conclude she has established an Equal Protection claim based on her nonselection to the positions identified in the Complaint. Put simply, there is no evidence before the Court that DCS engaged in discrimination on the basis of race. And for its part, DCS readily meets its "exceedingly light" shifted burden by presenting several race-neutral reasons for hiring the other candidates. *See Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989).

Moreover, DCS demonstrates a concerted effort to credibly corroborate its race-neutral reasons. As DCS personnel including Edwards, Weeks, Ledbetter, Jacobs and Cunningham detail in their respective affidavits, DCS hired on a position-specific basis and considered a number of hard and soft factors. For the positions from which Weatherington was rejected, these factors included each candidate's interview performance, references, prior experience, curriculum and assessment background, leadership qualities, relationships with other administrators

and school community, and track record. (*See* Doc. 18-2; Doc. 18-3, p. 2; Doc. 18-4, p. 3.) That these affidavits articulate these reasons with consistency and specificity to each position, despite the number of varying personnel involved with each hiring decision, bolsters their trustworthiness.

And a final note on DCS's stated reasons: the fact that they are largely subjective does not undercut their veracity. *See Denny v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001) ("Personal qualities … factor heavily into employment decisions concerning supervisory or professional positions. Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position.") (citations and quotations omitted); *Vessels*, 408 F.3d at 771 (employer may rely on subjective evaluations in hiring, so long as they are non-discriminatory, clear, and reasonably specific). DCS thus returns the burden to Weatherington for a showing of pretext.

### 3.   Evidence of Pretext

All told, Weatherington has failed to present any evidence of pretext that exposes DCS's hiring practices as "unworthy of credence." At best, Weatherington has offered conclusory allegations that for every job she applied to fill, she was equally or more qualified than the more successful candidate. True, she had served as a principal for fourteen months and had worked as a school administrator in

several DCS schools. But her self-professed credentials are not near sufficient to call into question whether the Board's reasons for hiring other candidates were mere pretext to conceal racial bias. *See Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996); *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) (plaintiff must do more than show that she was better qualified to prove pretext and further recognizing employer's considerable discretion in hiring so long as criteria is not unlawful).

Rather, a plaintiff "must show that the disparities between the successful applicant's and [her] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Barber v. Cellco P'ship*, 808 F. App'x 929, 936 (11th Cir. 2020) (citing *Cooper v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004)). Objectively speaking, and from what little is known about each individual's respective qualifications, Weatherington was equipped for the respective administrative positions; but she was not as equipped as Martin, Barker, Duke, Johnson, or Bouchard, to name a few.

Under the facts presented, DCS would have had no choice but to rely on its own subjective assessments of each candidate's application and interview. And here, even subjecting DCS's proffered reasons to close scrutiny, the Court can detect no basis for the claim that unlawful discrimination was at play. Here, the Court is

reminded of the difficulty that comes with proving a negative. But under this schematic, the onus rests on the plaintiff to support his or her claims. Weatherington has fatally neglected to highlight any contradictions, inconsistencies, or implausibilities in DCS's proffered reasons, and even damningly conceded that she "[doesn't] have any evidence." (Doc. 18-1, pp. 136-37.)

Further, where subjective factors drove a decision, it is not the Court's duty to "sit in judgment of the wisdom of an employer's selection." *Cooper*, 390 F.3d at 732; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). In the Court's view, it was reasonable for DCS to base its hiring choices upon Martin's preexisting relationships with her school community; Barker's five-years of experience as a principal; Duke's familiarity with federal funding; Johnson's extensive history with DCS; and Bouchard's IB background.

Tangentially, Weatherington also makes a vague argument that the apparent "pre-selection" of Martin at Cloverdale Elementary denotes pretext. (Doc. 26, p. 16.) She testified that the outgoing principal at Cloverdale had told several Cloverdale teachers that "Christy [Martin] was going to get the job," (Doc. 18-1, p. 78), a statement she believes constituted a blatant show of favoritism that disregarded the proper hiring procedures. But this belief ignores that it is the Court's duty to apply the law, not corporate policy. Simply because "preselection violates corporate personnel policies… does not necessarily indicate racial discrimination." *Springer,*

509 F.3d at 1350; *see also Jenkins v. Nat'l Waterworks, Inc.*, 502 F. App'x 830, 833 (11th Cir. 2012).

Even if the outgoing Cloverdale principal's preference for Martin had been improper, which is not supported by the record, there is no indication that the preference motivated the employment decision or would have been sufficient to do so. The Court cannot read the principal's isolated statement as discriminatory intent. Accordingly, Weatherington has failed to fulfill her shifted burden under *McDonnell Douglas* and the Court grants summary judgment in the Board's favor on this claim.

### ii. *Convincing Mosaic*

Alternatively, Weatherington cannot advance her claims under a "convincing mosaic" analysis. The Eleventh Circuit has made it clear that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, the plaintiff will survive summary judgment if she can present a "convincing mosaic" of circumstantial evidence that would permit a jury finding of intentional discrimination. *Lewis*, 918 F.3d at 1221. Weatherington and DCS have given no indication that they intend to proceed under the convincing mosaic standard, but out of an abundance of caution, the Court addresses it now.

A plaintiff can show a convincing mosaic with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)).

Weatherington's evidence is scarce and when considered cumulatively certainly does not rise to the level of a reasonable inference of discrimination. In support of her claims of discrimination, Weatherington points to DCS's dearth of uniform hiring procedures, (Doc. 26, p. 18), a newspaper article in which an individual expressed frustration with DCS's failure to prioritize diversity in hiring, (Doc. 26-1), alleged favoritism shown by the outgoing principals (all of their races unknown) at Cloverdale and Highlands, (Doc. 26, p. 16), and her own observation that DCS had hired a principal with no prior experience in elementary school administration at another elementary school in the district, (*id.*). Most of all, she condemns DCS's "invisible suspicious hand" that denied her jobs in favor of white candidates on the five separate occasions now at issue. (Doc. 26, p. 18.) Weatherington also questions DCS's reliance on subjective criteria in hiring – so subjective, she suggests, that they must create a triable issue of fact. (Doc. 26, p. 18.)

Viewed in the light most favorable to Weatherington, it is not difficult to see that she may feel personally slighted by DCS's intermittent rejection. But DCS was never under an imperative to hire Weatherington; its legal imperative was to refrain from discriminatory conduct. The Court cannot reasonably infer racial animus from the fact that DCS hired five white women and one white man to fill the positions that Weatherington targets in this lawsuit, especially given the evidence that DCS employed other black principals like Jeffrey Torrence and Darius McKay, (*see* Doc. 18-5), and treated other black candidates like Erica Hall and Charles Corbitt more favorably than Weatherington, (Doc. 18-3, p. 2; Doc. 18-1, pp. 136-37).

Weatherington's claims under the convincing mosaic standard fare no better than under the burden-shifting framework, and her incomplete mosaic cannot support a reasonable inference of discrimination. The Court confirms its conclusions that DCS is due summary judgment on Weatherington's race discrimination claims.

### c.    Retaliation

Title VII of the Civil Rights Act of 1964 forbids an employer from retaliating against an employee because of the employee's opposition to "any practice made an unlawful practice" by Title VII, or the employee's participation in "an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). As with the substantive race discrimination inquiry, the *McDonnell Douglas* burden-shifting

analysis also applies to retaliation claims relying on circumstantial evidence, such as this one.

"A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). An employee who makes out a prima facie case creates a presumption that the adverse action was the product of an intent to retaliate.

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its employment decision. *See Laosebikan v. Coca-Cola Co.*, 167 F. App'x 758, 764 (11th Cir. 2006). The ultimate burden of proving by a preponderance of the evidence that the employer's reason is pretext for prohibited conduct remains with the plaintiff. *Id.*

DCS asserts that, as to all positions, Weatherington has failed to demonstrate the first and third elements required for her retaliation claim, which Weatherington disputes. But because Weatherington's only actionable retaliation claim is that concerning the principal position at Highlands Elementary school, that is the only claim the Court addresses here. Ultimately, due to the absence of any protected activity and the insufficiency of her causal allegations, Weatherington cannot establish a prima facie retaliation claim.

###### i.     Protected Activity

Title VII recognizes two forms of statutorily protected expression, including (1) opposing an employment practice made unlawful under Title VII (the opposition clause); or (2) charging, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing (the participation clause). 42 U.S.C. § 2000e–3(a); *Ceus v. City of Tampa*, 803 F. App'x 235, 245 (11th Cir. 2020).

If making a claim based on the former opposition clause, a plaintiff must have a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). Under this standard, a plaintiff must show both that she subjectively believed her employer was engaged in unlawful employment practices and that her belief was objectively reasonable. *Id*.

The latter participation clause protects conduct, for example, associated with or following the formal filing of an EEOC charge; however, it offers no protections to employees who participate in internal business decisions or investigations apart from a formal EEOC charge. *See, e.g.*, *Ceus*, 803 F. App'x at 245; *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000). It now bears repeating that "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII." *Coutu v. Martin Cty. Bd. of*

46

*Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (holding employee's written grievance to employer containing conclusory race discrimination allegations lacked supporting proof and thus did not constitute protected activity).

The sole basis for Weatherington's retaliation claim is the Settlement Agreement she reached with DCS in February 2016, (*see* Doc. 18-8), which followed her removal from Honeysuckle as the principal and facilitated her transfer to Dothan High as an assistant principal. In this instance, even if Weatherington subjectively believed that DCS was engaging in unlawful discrimination, the parties' conduct following the removal does not support an objectively reasonable belief that DCS was unlawfully discriminating against her. For Weatherington's part, she made no mention to anyone at DCS that her discontentment with the removal stemmed from her belief that it was discriminatory. In fact, she only communicated about the transfer with two DCS officers: Ledbetter and then-Board-member Jones. She spoke to Ledbetter upon receiving notice of the transfer, but rather than vocalizing her belief that his desire to "go in a different direction" was discriminatory, she only told him that she would not sign the letter and promptly left the meeting. (Doc. 18-1, pp. 28-29.) Jones, to whom she spoke immediately after meeting with Ledbetter, confirmed that Ledbetter removed her from Honeysuckle based on Ledbetter's desire to take Honeysuckle in "a different direction." (*Id.*, p. 33.) From the facts,

Jones said nothing to insinuate that racial bias prompted Ledbetter's conduct, and neither did Weatherington at the time.

From the record, the Court cannot glean discriminatory motive on the part of DCS either before or after the removal, nor can it point to any moment at which DCS would have learned that Weatherington believed DCS's decision to remove her from Honeysuckle was discriminatory. Weatherington presents no evidence that she opposed the removal on grounds of discrimination, and further fails to show that DCS would have been able to infer as much. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("[Courts] are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

While it is true that Weatherington spoke with AEA and retained counsel, there is no indication or evidence that any of these representatives made any mention of discrimination in their conversations with DCS personnel, even in the course of negotiating the Settlement Agreement. True, formal or informal complaints of discrimination may constitute protected activity under Title VII, but excluding any mention of discrimination whatsoever from those complaints removes any Title VII protections where inferences of discrimination are not objectively reasonable. *See, e.g.*, *Ceus v. City of Tampa*, 803 F. App'x 235, 248 (11th Cir. 2020) (employee's

48

letter demanding a reimbursement for forced leave time that did not reference race or discrimination does not fall within Title VII's ambit); *Herron-Williams v. Alabama State Univ.*, 805 F. App'x 622, 632 (11th Cir. 2020) (email sent by employee with only one unsubstantiated and conclusory allegation of discrimination was not legally protected activity); *Biggers v. Koch Foods of Alabama, LLC*, 461 F. Supp. 3d 1176, 1186 (M.D. Ala. 2020) (internal complaints that made no mention of racial discrimination not protected conduct).

Unfair treatment is not necessarily unlawful discrimination, and in this case, it is not objectively reasonable to believe that DCS's negative treatment of Weatherington was based on race, particularly when acknowledging that Weatherington's replacement at Honeysuckle was a black male. (Doc. 18-1, p. 194.) In short, the Settlement Agreement reached between DCS and Weatherington (along with the preceding negotiations) in 2016 does not constitute statutorily protected activity under Title VII; thus, granting summary judgment on her retaliation claim relating to the Highlands principal position is proper.

### ii.     *Causal Connection*

Even assuming *arguendo* that Weatherington has adduced sufficient evidence to demonstrate she engaged in protected activity, she still cannot establish the causal link requirement. To do so, a plaintiff must prove that the relevant decisionmaker knew of the protected activity and that the protected activity and adverse

employment action were not wholly unrelated. *See Johnson v. Coffee Cty. Comm'n*, 714 F. App'x 942, 945 (11th Cir. 2017). "A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Weatherington applied for the Highlands Elementary Principal position in June 2018 – more than 2 years after finalizing her Settlement Agreement in February 2016. This length of time is certainly not "very close" by ordinary standards, and for Title VII purposes is so substantial that Weatherington's claim must fail as a matter of law. *Id*. at 1221 (3-month period insufficient to show causal relation); *Simpson v. State of Alabama Dep't of Human Res.*, 501 F. App'x 951, 955 (11th Cir. 2012) (outer limit for the test of close temporal proximity sits at around three or four months).

The record is further void of any evidence indicating the hiring personnel had "actual awareness" of Weatherington's Settlement Agreement. The "actual awareness" requirement "rests upon common sense…. A decisionmaker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Hence, the knowledge of a non-decisionmaker cannot be imputed to the decisionmaker. *Id*. at 800. Hiring for the Highlands position was conducted by unnamed persons on an interview panel,

and Dr. Edwards made the final decision to recommend hiring Barker to the Board. Dr. Edwards, who claims not to have had any knowledge of the Settlement Agreement until this lawsuit was filed in 2019, did not become superintendent of DCS until February 2018. (Doc. 18-2, p. 2.) Based on this timeline and the evidence in her affidavit, she would have had no knowledge of the Settlement Agreement at the time she made the hiring recommendation for the Highlands position in June 2018. (*Id.*) Weatherington not only neglects to dispute this, but also stated in her deposition that she "didn't accuse Dr. Edwards of retaliating none (*sic*)." (Doc. 18-1, p. 151.) Moreover, Weatherington did not even interview for the position, so her name would not have been among those presented to Dr. Edwards for the final selection. Therefore, a retaliation claim against the Board based upon Dr. Edwards' conduct cannot stand.

It would be speculative, at best, to assert that any of the decisionmakers in this case – be it the interview committee, Dr. Edwards, or the Board – were influenced not to hire Weatherington based on racial bias. But a mere "hunch" that another employee with knowledge of the protected expression informed a decisionmaker of the protected expression does not constitute the "significant probative evidence" necessary to avoid summary judgment. *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997). The record lacks the substantive evidence that

would be necessary to infer causation in this case, and summary judgment is due to be granted on Weatherington's remaining retaliation claim.

### d. Equal Pay Act

Weatherington asserts an additional claim, premised on the male comparators' salaries set forth above, that DCS paid her less than similarly situated black male principals and that the pay disparity constitutes wage discrimination under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").[13] To prevail on her EPA claim, Weatherington must demonstrate a prima facie case that DCS paid Weatherington less than it paid men "for equal work for jobs which require equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *see Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077–78 (11th Cir. 2003).

---

[13] In the Complaint, Weatherington challenges the pay disparity under the heading "Equal Pay Act Violation," which ostensibly implies that she brings this claim under the Equal Pay Act. (Doc. 1, p. 10.) However, in Paragraph 24 of the Complaint, she notes that the disparities violate "Title VII of the Civil Rights Act of 1964." (*Id.*) True, a plaintiff can sue his employer under Title VII and the EPA, and the Eleventh Circuit has explained that the similarities and differences between these statutory remedies hinge on the plaintiff's burden of proof. *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992). Whereas the EPA requires a plaintiff to meet a "fairly strict" burden of proving she did "substantially similar" work for less pay before shifting the burden of producing an affirmative defense on to the defendant, Title VII only requires a plaintiff to show a more "relaxed standard of similarity" between the jobs, but must prove an intent to discriminate on the basis of sex. *Id.* For the sake of completeness, the Court notes that to the extent Weatherington alleges wage discrimination under Title VII, her claim is unavailing. Just as she has neglected to produce any evidence that DCS's legitimate, non-discriminatory salary matrix was pretext for discriminatory conduct, she has likewise neglected to make a showing that DCS engaged in intentional discrimination when it paid her male comparators more based on their completion of a probationary period. *See Reddy v. Dep't of Educ., Alabama*, 808 F. App'x 803, 813 (11th Cir. 2020) (gender neutral reason for pay disparity precluded finding of wage discrimination under both the EPA and Title VII).

If Weatherington is able to make such a showing, DCS may avoid liability by presenting an affirmative defense that the payments were made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor than sex." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995). This heavy burden requires DCS to demonstrate that "the factor of sex provided *no basis* for the wage differential." *Steger*, 318 F.3d at 1078 (citation omitted). Finally, Weatherington may attempt to demonstrate that a genuine issue of material fact exists with respect to the defendant's affirmative defense by presenting evidence that the reasons proffered for the wage differential were merely pretext for unlawful wage discrimination on the basis of gender. *See Irby*, 44 F.3d at 954.

DCS argues there has been no violation of the Equal Pay Act. First, it contends the inequality in pay was due to Weatherington's probationary status. Second, it claims the wage differential was, to quote the statute, based on a "factor other than sex." This factor was the completion of a probationary period, as it claims Ala. Code § 16-8-23 makes compulsory. At the outset, the Court recognizes it is undisputed that salaries awarded under probationary principal contracts are lower than those awarded under three-year principal contracts that typically follow probationary contracts. It is further undisputed that Weatherington herself was employed pursuant to such a probationary principal contract. And for the reasons discussed below, the

Court concludes that DCS is entitled to summary judgment on Weatherington's EPA claim.

### i.    *Prima Facie Case and Comparators*

Though her EPA claim is ultimately nonmeritorious, Weatherington has identified sufficient evidence to suggest that males Jeffrey Torrence and Darius McKay were paid comparably more than she was paid during her tenure as principal at Honeysuckle Middle School for the job of principal. Notably, to meet her burden, Weatherington must show that the jobs at issue are "substantially equal" in terms of skill, effort and responsibility; however, she need not show that the skills or qualifications of the males holding the positions are substantially equal to her own. *See Arrington v. Cobb Cty.*, 139 F.3d 865, 876 (11th Cir. 1998), *as amended* (May 28, 1998). The controlling factor for consideration is the job content, though job titles may also be considered in the court's assessment. *Id.*

DCS disputes that Weatherington has made a prima facie showing on the grounds that she was awarded a probationary contract, and that it would be imprudent to compare Weatherington's probationary contract salary to that of a principal who has already completed his probationary period. But it is important to bear in mind that the prima facie case under the EPA is established by comparing the jobs held by female and male employees, and not by comparing the relative backgrounds and qualifications of the individuals in those positions. *See Brock v.*

*Georgia Sw. Coll.*, 765 F.2d 1026, 1032 (11th Cir. 1985), *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). Thus, neither DCS nor this Court can rely on Weatherington's probationary status, alone, to defeat her prima facie showing.

To the contrary, all evidence in the record supports a finding that the middle school principal positions held by Weatherington, Torrence, and McKay entailed substantially similar, if not the same, responsibilities and were held under substantially similar conditions. In fact, based on the record, the Court recognizes that all three individuals were placed in middle schools facing certain struggles.[14] Weatherington was placed at Honeysuckle – a school that by DCS's own account was "struggling." (Doc. 18-4, p. 2.) Torrence was also placed at Honeysuckle as the principal, where he replaced Weatherington when she was transferred away in 2016 pursuant to the Settlement Agreement. McKay was the principal at Girard Middle School, which Ledbetter also described as a school "facing some struggles." (*Id.*) DCS's assertions that the unique professional circumstances facing Torrence and McKay in their respective school environments set them apart overlook the fact that Weatherington herself worked in a "struggling" school. Yet Weatherington was paid

---

[14] DCS does not explain the specific duties and responsibilities that each principal held or how they might differ from school to school. Instead, it argues that the working conditions were different because certain middle schools, *i.e.*, Honeysuckle and Girard, faced certain struggles, though it does not apprise the Court of what those struggles were. (*See* Doc. 19, pp. 50-51.)

$80,659.50 annually, as compared to Torrence and McKay's respective annual salaries of $95,220.00. To this end, DCS's argument that Torrence and McKay worked principal jobs incomparable to Weatherington's principal job is unavailing, as it presents a question of fact on which reasonable jurors could differ. And because Weatherington's probationary status is better considered as part of DCS's affirmative defense, the Court moves on to the next stage in its assessment.

### ii.   *Affirmative Defense*

While the Court finds that Weatherington has met her prima facie burden, DCS more than successfully refutes her EPA claim in its entirety. As it explains in its motion, the wage differential Weatherington challenges is not based upon gender, but rather on each principal's prior relevant experience under a matrix. More precisely, DCS awards all first-time principals a probationary contract to last for a period of one to two years. Only upon completion of this probationary period are principals eligible for a three-year contract and higher annual salary. (*See* Doc. 18-5.) But Weatherington herself was not eligible for such a contract when she was hired as a principal at Honeysuckle.

This affirmative defense fits squarely into the general exception to the EPA, which allows employers to submit evidence that the wage differential is based on any factor other than sex.   29 U.S.C. § 206(d)(1). The Eleventh Circuit has interpreted this language to include such factors as "unique characteristics of the

same job; ... an individual's *experience,* training or ability; or ... special exigent circumstances connected with the business." *Irby*, 44 F.3d at 955 (quoting *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)).

At all times relevant to Weatherington's EPA claim, she was employed under a probationary contract and was thus considered a probationary principal. Torrence and McKay, too, were once employed as probationary principals, but had completed their probationary periods and been elevated to contract principal status pursuant to three-year employment contracts. Notably, while employed as probationary principals, Torrence and McKay were paid $80,251.86 and $78,164.47, respectively. These amounts are *less* than Weatherington's probationary salary of $80,659.50, and they indicate clearly to the Court that DCS's salary matrix and probationary contract distinction are gender neutral.

Moreover, Weatherington's comparators were awarded salaries based upon meaningful differences in experience level. Torrence spent two years as a principal prior to attaining contract principal status and taking over at Honeysuckle (time earned during his probationary period), and McKay had amassed two years of experience as a principal, plus six years of experience as an assistant principal in a different school system. Again, Weatherington had never held a principal position. This comparative difference in experience alone serves as a valid justification for the male principals' wage differentials that the Court will not second-guess

retroactively, especially since it appears that Weatherington actually earned more when all three individuals' probationary salaries are compared. *See Irby*, 44 F.3d at 956 (experience is an acceptable factor other than sex, so long as it is not used as a pretext for gender discrimination); *Blackman v. Fla. Dep't of Bus. & Prof'l Regulation*, 599 F. App'x 907, 912 (11th Cir. 2015) (differences in experience and education between male and female employee sufficient to demonstrate a factor other than sex).

### iii.        *Evidence of Pretext*

Weatherington offers no evidence to create a triable issue that DCS's salary matrix was offered as pretext for gender discrimination. She concedes that she was employed under a probationary contract, (Doc. 18-1, p. 49), and beyond shallowly questioning the distinction between probationary and contract status, (Doc. 26, p. 23), proposes nothing to rebut DCS's legitimate, non-discriminatory methods for determining principal salaries. A plaintiff cannot show pretext simply by disagreeing with the wisdom of an employer's decision. *See, e.g.*, *Mahone v. BBG Specialty Foods, Inc.*, No. 1:16CV00655-SRW, 2018 WL 1526336, at *8 (M.D. Ala. Mar. 28, 2018). And this Court is not under any obligation to consider mere conclusory testimony. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 and n. 6 (11th Cir. 1998). Weatherington's glaring failure to present any evidence

that undercuts DCS's gender neutral salary matrix is a clear indication that this claim cannot stand; accordingly, the Court grants summary judgment on her EPA claim.

## VII.   CONCLUSION

For the foregoing reasons, the Board's Motion for Summary Judgment, (Doc. 18), is GRANTED as to all claims in the Complaint and this case is dismissed with prejudice. Costs shall be taxed against the Plaintiff.

DONE, this 28th day of December, 2020.

_____ /s/ R. Austin Huffaker, Jr. _____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE